**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DAMPSKIBSSELSKABET NORDEN A/S, | § | |
| | § | **CIVIL ACTION NO.** |
| Plaintiff, | § | |
| v. | § | **26-cv-__________** |
| | § | |
| POLARIS BANK LIMITED, | § | **ADMIRALTY RULE 9(h)** |
| | § | |
| Defendant. | § | |

## VERIFIED COMPLAINT

Plaintiff Dampskibsselskabet Norden A/S ("**Norden**") files this Verified Complaint against Defendant Polaris Bank Limited ("**Polaris**"), stating admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("**Supplemental Rule B**"), and alleges on knowledge as to its own acts and upon information and belief as to Polaris and third parties as follows:

## SUBJECT MATTER JURISDICTION

1. This is an admiralty or maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and 28 U.S.C. § 1333.

## PARTIES

2. Norden is a company organized under the laws of Denmark with a registered address at 52, Strandvejen DK-2900, Hellerup, Denmark, and is a global provider of ocean-based freight services. At all relevant times, Norden was the disponent owner of the vessel LADY DEMET (the "**Vessel**").

3. Upon information and belief, Polaris is a Nigerian bank with a registered office in Lagos, Nigeria that was the holder of bills of lading for cargo that it was financing.

**Facts giving rise to the Maritime Claim**

4. In 2021, a cargo of gypsum in bulk (the "**Cargo**") was shipped by an exporter named Gypse Expo from Safi, Morocco to Lagos, Nigeria. The Cargo was being purchased by Quattro Marine and Petrochemical Nigeria Limited ("**Quattro**") (a Nigerian company) for onward sale to Lafarge Africa PLC ("**Lafarge**").

5. Upon information and belief, Polaris was financing the purchase of the Cargo on behalf of Quattro, including by opening a letter of credit and advancing funds to Gypse Expo.

6. On June 28, 2021, Norden entered into a voyage sub-charter of the Vessel with Quattro for the carriage of the Cargo from Safi to Lagos (the "**Charterparty**"). The head owner of the Vessel, as set forth under that Charterparty, was Lady Demet Shipping Ltd ("**Head Owner**"). (A true and correct copy of the Fixture Recap and Charterparty dated June 28, 2021, are attached hereto as Exhibit 1).

7. The relevant terms of the Charterparty, which is governed by English law, are set forth below:

> 1. SOLE AND COMPLETE CARGO OF 27000+ /-10% MOLOO MT GYPSUM IN BULK GROUP C ALWAYS AS PER IMSBC
> 2. LOADPORT: SAFI, MOROCCO
> 3. DISCHPORT: 1 SAFE PORT 2 SAFE BERTH LAGOS, NIGERIA DA'S AT DISCHARGE PORT OF LAGOS TO BE FOR CHRTR ACCOUNT.
> SHIFTING TIME IF 2 BERTH IN LAGOS TO COUNT AS DEMURRAGE
> . . .
> 5. LAYCAN: 6/16 JULY 2021
> 6.FREIGHT: USD 39,95 PMT
> FREIGHT TO BE PAYABLE 100% 3 DAYS AFTER SIGING *[sic]*/RELEASING BILLS OF LADING
> FRT DEEMED EARNED UPON COMPLETION OF LOADING DANRVAOCLONL.
> . . .
>
> CHRS ARE RESPONSIBLE TO COMPENSATE OWNER BY THE AGREED DEMURRAGE RATE ONLY
> DA'S AT DISCHARGE PORT OF LAGOS TO BE FOR CHRTR ACCOUNT.

> SHIFTING TIME IF 2 BERTH IN LAGOS TO COUNT AS DEMURRAGE
> ...
>
> 7.LOAD RATE: 10,000 MT PER WWD OF 24 CONSEC HRS SHINC
> 8. DISCH RATE: 5,000 MT PER WWD OF 24 CONC HRS SHINC
> 9. DEM: USD 35,000 PDPR / HD BENDS
> DEMURRAGE AT THE LOADING AND DISCHARGING PORT IS PAYABLE BY THE CHARTERERS AT THE RATE STATED IN BOX 20 IN THE MANNER STATED IN BOX 20 PER DAY PRO RATA FOR ANY PART OF A DAY. DEMURRAGE SHALL FALL DUE DAY BY DAY. LOAD PORT DEMURRAGE SHALL BE PAYABLE WITHIN ONE DAY OF COMPLETION OF LOADING.
> NOTWITHSTANDING THE FOREGOING IF, UPON TENDERING OF NOR AT DISCHARGE PORT, OWNERS' AGENTS' PROSPECTS INDICATE THAT DEMURRAGE WILL BE INCURRED, SUMS REPRESENTING THE ANTICIPATED DEMURRAGE, ALTHOUGH NOT YET INCURRED, SHALL BECOME IMMEDIATELY PAYABLE IN ADVANCE. OWNERS SHALL GIVE CHARTERERS 24 RUNNING HOURS WRITTEN NOTICE TO MAKE SUCH PAYMENTS. CHARTERERS CONFIRM THAT SUCH ANTICIPATED DEMURRAGE, IF NOT PAID IN ACCORDANCE WITH THE FOREGOING, SHALL BE CONSIDERED DUE UNDER THIS CHARTER PARTY, ENTITLING OWNERS TO EXERCISE A LIEN ON THE CARGO AND ON ALL SUB-FREIGHTS IN ACCORDANCE WITH CLAUSE 8.
> FOLLOWING COMPLETION OF DISCHARGE, ANY ADDITIONAL DEMURRAGE INCURRED BUT NOT YET PAID, SHALL BE PAYABLE UPON RECEIPT OF OWNERS' INVOICE.
> IF CHARTERERS FAIL TO COMPLY WITH ABOVE PAYMENT TERMS OWNERS HAVE THE OPTION TO CANCEL THE CP
> ...
> 18. LAYTIME TO COUNT AT 14:00 HOURS IF N.O.R. IS TENDERED BEFORE NOON OR AT 08:00HOURS NEXT DAY IF N.O.R. IS TENDERED AFTER NOON."
> LAYTIME TO BE NON REVERSIBLE BETWEEN LOAD/DISCH
> ...
> 28. ANY TAXES/DUES ON CGO, VESSEL, FLAG TO BE FOR CHRS ACCT
> ...
> 36. OTHERWISE FURTHER TERMS/CONDITIONS AS PER STANDARD GENCON CP WITH LOGICAL ALTERATIONS AND AMENDMENTS AS PER MAINTERMS
>
> Gencon Form
> 8. Lien Clause
> The Owners shall have a lien on the cargo, and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same
> 13. Taxes and Dues Clause
> (a) ...
> (b) On cargo - The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.

8. On July 16, 2021, laytime commenced as the Vessel arrived in Safi, but loading was delayed until August 27, 2021, resulting in accruing demurrage payable to Norden.

9. On August 18, 2021, in light of the delays and Quattro's accrued and accruing liability for demurrage, Quattro provided a signed addendum to the Charterparty, pursuant to which it agreed that it "unconditionally, and irrevocably guarantee to pay Owners" outstanding freight and lumpsum demurrage.

10. Also on August 18, 2021, Quattro acknowledged not less than $1,038,700 in owed freight and $1,231,933,34 in loadport demurrage.

11. On September 1, 2021, the Vessel completed loading the Cargo.

12. On September 1, 2021, a bill of lading was issued, signed and released for the carriage of the Cargo on board the Vessel (the "**Original Bill**"). The shipper was named as Gypse Expo, the consignee was named as "to the order of Polaris Bank Ltd", and the notify address was that of Quattro. The Original Bill was signed by the Master of the Vessel. (A true and correct copy of the original bill of lading, dated September 1, 2021, is attached hereto as Exhibit 2.)

13. The Original Bill, under the Conditions of Carriage, provides that "[a]ll terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated", which Norden takes to include the obligation to pay freight and demurrage.

14. At that time, the total freight payable under the Charterparty and the Original Bill was $1,052,682.50 (additional cargo having been loaded over 26,000 MT), payable three days after the signing of the Original Bill.

15. At that time, the loadport demurrage payable under the Charterparty and the Original Bill was $1,553,261.11, payable one day after completion of loading.

16. On September 10, 2021, in light of nonpayment, Norden (through counsel) gave Polaris and Quattro notice that it was exercising a lien over the Cargo in accordance with its rights

under the Charterparty. Norden also advised that Quattro would be liable for any detention accruing during the time spent waiting for payment, and that the Master would be ordered to remain outside port limits and not to discharge. Polaris was advised that it should liaise with Quattro if it had concerns about delays.

17. To give effect to Norden's lien rights, the Vessel waited off Lagos after completing the sea passage on September 12, 2021.

18. On each of September 14 and 15, 2021, Norden gave Polaris notice that outstanding freight/loadport demurrage charges remained, and of its exercise of the lien, seeking an update on payment of sums due.

19. On September 14, 2021, $400,000 was paid toward loadport demurrage (the only sums which have been paid thus far).

20. On September 15, 2021, discharge demurrage charges started to accrue.

21. On September 24, 2021, Norden (through counsel) wrote to Polaris seeking confirmation that it was the then-current holder of the Original Bill. On that same day, Head Owner assigned its rights under the Original Bill to Norden.

22. On September 25, 2021, the Vessel arrived in Lagos. However, discharge of the Cargo did not start at that time.

23. On September 25, 2021, Polaris emailed Norden's solicitors, stating "Polaris Bank confirms that the bank is the current holder of the relevant Bill of Lading for this cargo of Gypsum in bulk to be discharged and delivered to Lafarge Africa Plc."

24. On September 25, 2021, Quattro requested that the Vessel partially discharge the Cargo at Lagos and then discharge the balance of the Cargo at Calabar, Nigeria.

25. On the same day, in response, Norden advised that the additional voyage to Calabar was not covered by the Charterparty, and would result in the incurrence of additional costs, including freight of $108,293.38 and security costs.

26. On September 27, 2021, Norden repeated to Quattro with Polaris in copy that $108,293.38 in additional freight would be due for the partial discharge in Calabar, along with other costs, and potential costs which might be imposed by the Head Owners (including additional war risk premium (AWRP)), and Norden requested the surrender of the Original Bill and the re-issuance of new bills of lading reflecting the discharges in the respective discharge ports, namely Lagos and Calabar.

27. On September 28, 2021, Norden (through counsel) again wrote to Quattro and Polaris (and Lafarge), setting forth the conditions to be satisfied in order for the lien over the Cargo to be lifted, including the payment of $108,293.38 in additional freight, the AWRP and any other associated costs.

28. On September 29, 2021, Polaris confirmed that the Original Bill was going to be presented and that discharge at Lagos and Calabar was to be considered as delivery under the Original Bill, and expressly demanded that Norden proceed with the delivery/discharge of the Cargo.

29. On October 8, 2021, as a result of Norden's request, two replacement bills of lading were issued (the "**New Bills**"), also to the order of Polaris as consignee, for discharge of 13,350mt in Lagos and the balance (13,000mt) in Calabar. (A true and correct copy of the new bills of lading, dated October 8, 2021, are attached hereto as Exhibit 3.)

30. The New Bills under the Conditions of Carriage, provide that "[a]ll terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and

Arbitration Clause, are herewith incorporated", which Norden takes to include the obligation to pay freight and demurrage.

31. On October 27, 2021, Polaris as holder of the New Bills demanded delivery of the Cargo in part at Lagos and the balance at Calabar.

32. On October 27, 2021, as part of Polaris's demand for delivery of the Cargo, Polaris implicitly agreed to pay the unpaid freight and demurrage charges relating to the loadport, and the additional freight and demurrage and other costs to be incurred for discharge at Calabar.

33. On October 28, 2021, Norden commenced the discharge of the Cargo at Lagos.

34. On November 10, 2021, laytime/time on demurrage came to an end at Lagos.

35. As a result of the foregoing, demurrage in the sum of $1,985,404.17 became due for the Lagos discharge.

36. On November 10, 2021, the Vessel was ordered to Calabar, which resulted in additional freight charges of $108,293.38.

37. On November 12, 2021, the Vessel arrived at Calabar.

38. On November 15, 2021, the Vessel came on demurrage.

39. On November 26, 2021, Norden commenced the discharge of the Cargo at Calabar.

40. On December 8, 2021, laytime/time on demurrage came to an end at Calabar, and resulted in demurrage charges for the Calabar disport of $811,586.81.

41. Norden also claimed the recovery of an additional war risk premium, K&R (kidnap & ransom) and loss of hire premiums in the total sum of $149,107.06 in relation to the additional call to Calabar (either on a contract or quantum meruit basis).

42. On December 15, 2021, Head Owner assigned its rights under the New Bills to Norden.

43. Additional delay/bunker costs were incurred at Lagos in the amount of $27,724.70, which also became due for the Lagos discharge, while the Vessel waited for armed guards to disembark at Lagos.

44. By reason of Polaris's demands for delivery of the cargo, made on September 29, 2021 and/or October 27, 2021, made as the lawful holder of the Original Bill and/or the New Bills, Norden asserts that Polaris became liable to Norden under English law (namely Section 3(1) of the Carriage of Goods by Sea Act of 1992) for all of the aforesaid sums, totaling **$5,288,069.73.**

45. As an alternative basis for recovery under English law, in response to Polaris's above-referenced demands for delivery, the first of which was made no later than September 29, 2021, and which were made with knowledge of the unpaid freight and demurrage charge relating to the loadport, and the additional freight and demurrage and other costs to be incurred for discharge, Norden commenced the discharge of the Cargo at Lagos.

46. It is apparent from the course of the correspondence between and among the parties that Norden properly and necessarily sought the involvement and agreement of Polaris as holder of the Original Bill/New Bills for carriage of the cargo to Calabar and delivery to Lafarge.

47. It is also apparent from the course of the correspondence between and among the parties and from Polaris's demands for delivery that Polaris agreed to the terms set forth by Norden, which was a pre-condition to Norden lifting the lien and its further carriage of the Cargo, and Norden would not have lifted the lien or carried the cargo to Calabar but for Polaris's agreement and demands.

48. Furthermore, Polaris was at all times aware that freight and demurrage was unpaid, and that, if the cargo was to be delivered at Calabar, as Polaris directed, additional freight would be incurred (self-evidently, since the voyage was not the voyage under the Original Bill) as well

as additional costs. These costs were indicated to Quattro and Polaris. Polaris was perfectly content with this, no doubt for its own commercial ends. Polaris at no time entered any reservation as to the further freight or costs that were identified by Norden.

49. It is also perfectly proper that Polaris, as the party demanding delivery - and not simply acting as a party with a security interest in the Original Bill/New Bills – should shoulder the burden as well as take the benefit of the Original Bill/New Bills and pay the costs incurred in carrying the cargo to its place of delivery, and particularly where Polaris demanded delivery with knowledge of the freight unpaid, the fact of unpaid demurrage and the scale of additional freight and costs for delivery at Calabar.

50. In addition, Norden exercised a lien, to Polaris's knowledge, over the cargo for the purpose of securing Norden's claim to freight and demurrage then accrued and unpaid, and lifted that lien, to Polaris's knowledge, on the basis of Polaris's agreement and demand for delivery. Norden thus lost and forewent the security to which it was entitled under the Original Bill/New Bills.

51. Norden thereby asserts that Polaris is now estopped from contending that it is not liable under the Original Bill/New Bills for the unpaid freight and demurrage, which was the subject of the lien.

52. In view of the foregoing and for all the reasons set forth above, under English Law, Polaris may be alternatively liable at law and/or in equity for the additional costs that were incurred by Norden as a result of and which accrued after Polaris's demands for delivery from and including September 29, 2021, by reason of its acceptance of Norden's terms and conditions and/or estoppel principles.

**Underlying arbitration and fees**

53. On or about May 6, 2022, Norden commenced arbitration against Polaris before the London Maritime Arbitrators Association (LMAA).

54. In the pending LMAA arbitration, by final partial award issued March 30, 2026, Norden has already been awarded a recovery for original freight to Lagos of **$1,052,692.50** plus interest at the rate of 5% per annum compounded quarterly from September 25, 2021, until payment.

55. In the pending LMAA arbitration, Norden has also made claims for the following additional damages from Polaris as set forth in its claim submission:

1. Additional freight for Calabar $108,293.38
2. AWRP and K&R/LOH $149,107.06
3. Loadport demurrage $1,553,261.11
4. Less part payment ($400,000.00)
5. Disport (Lagos) demurrage $1,985,404.17
6. Disport (Calabar) demurrage $811,586.81
7. Additional delay/bunker costs at Lagos $27,724.70

**Total $4,235,377.23**

56. Alternatively, Norden has pled sufficient facts in its claim submission and amended reply submission to support the alternative theory of recovery set forth above, for the following damages from Polaris, starting as of September 29, 2021 (the latest date of Polaris's first demand for delivery and its alleged acceptance of Norden's conditions thereto):

1. Disport (Lagos) demurrage of $1,504,272 (calculated from September 29, 2021 through November 10, 2021 for 42 days, 23 hours and 30 minutes @ $35,000 per day pro rata)
2. Disport (Calabar) demurrage $ 811,586.81

3. Additional freight for Calabar $108,293.38

4. Additional delay/bunker costs at Lagos $27,724.70

**Total $2,451,876.89**

57. Polaris has not paid any monies to Norden toward the final partial arbitration award or otherwise in the arbitration, which remains pending.

58. The Charterparty (incorporated by the Original Bill and the New Bill) provides that all disputes between the parties shall be submitted to arbitration in London, with English Law to apply thereto.

59. Under English Law, pursuant to Section 61(2) of the Arbitration Act of 1996, costs follow the event; such costs to include the costs of arbitration and litigation, including attorneys' fees, costs, and expenses.

60. In accordance with the foregoing, Norden seeks security comprised of the following alternative components, namely (a) not less than the amount of the final partial award of $1,052,692.50 plus either (b) the total remaining amount sought to be recovered in the LMAA arbitration of $4,235,377.23, or (c) the amount of $2,451,876.89, which is predicated on the alternative theories of recovery. In all events, Norden also seeks security which includes (w) interest on the final partial award at the rate of 5% per annum compounded quarterly from September 25, 2021 in the amount of $278,711.50, plus (x) UK arbitration costs and fees incurred to date (namely $51,688.12 based on the GBP-to-USD exchange rate of 1.3421 as of June 16, 2026), (y) plus anticipated UK arbitration fees of $362,433.90 (based on the aforementioned exchange rate), (z) plus U.S fees and costs incurred to date of $20,000, totaling $712,833.52.

61. Norden reserves all rights to seek increased security as may be needed in this proceeding. Likewise, Norden reserves all rights to seek and recover the full quantum of its damages, attorneys' fees, costs, interest and other expenses in arbitration in England.

**BREACH OF MARITIME CONTRACT**
**GIVING RISE TO ADMIRALTY CLAIM UNDER U.S. LAW**

62. Each of the Original Bill and the New Bills is a quintessential maritime contract, as it is a contract of carriage with a carrier for the marine transport of goods.

63. Polaris breached its obligations to pay sums owed as a holder of the Original Bill and/or the New Bill, each of which incorporate the terms of the Charterparty, in the various ways set forth above, despite due demand.

64. By failing to pay the amounts owed to Norden, Polaris has thereby breached a maritime contract, giving rise to a quintessential maritime or admiralty claim.

**SUPPLEMENTAL RULE B ALLEGATIONS**

65. As set forth above, pursuant to the Original Bill and/or the New Bill, each of which incorporate the terms of the Charterparty, the underlying merits of the dispute are being resolved by arbitration in London. Norden expressly reserves all its rights to continue to arbitrate the merits of the underlying dispute.

66. Norden brings this action solely to obtain *quasi in rem* jurisdiction over Polaris and to secure the claims being pursued in the London arbitration more fully described above.

**Polaris cannot be found in this District.**

67. After a diligent search, as is set forth in the accompanying Declaration of Joseph T. Johnson, Norden respectfully submits that Polaris cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

68. Diligent searches of the website maintained by the New York Secretary of State, of the internet Whitepages directory, and a general internet search via Google did not identify Polaris as:

a) Ever being registered or authorized to transact business in the State of New York;

a) Being incorporated or registered in the State of New York;

b) Having appointed an agent for service of process in this District; or

c) Having any other presence in this District.

69. Further, Norden is unaware of Polaris having any general or managing agents in this District.

70. Polaris cannot be "found" within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims. Norden seeks an Order of Attachment against such property, tangible or intangible, of Polaris as may be found within the District, up to and including the full amount claimed herein (and subject to Norden's reservation of all rights to adjust that amount as may become necessary and proper).

71. Norden is accordingly entitled to attach Polaris's property within this District pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

**Property of Polaris is likely in this District.**

72. Upon information and belief, Polaris has now and will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees within the District which will be owned by or due and owing to Polaris. (*Id.*).

73. Upon information and belief, the specific, known garnishees likely holding cash or assets owned by Polaris or due and owing to Polaris in this District are Citibank, Standard Chartered

Bank, and United Bank for Africa (the "**Garnishees**", as more fully set forth on Schedule 1 hereto) (although Norden reserves the right to amend and supplement with respect to additional garnishees).

74. The information upon which the foregoing reasonable beliefs stated in the preceding two numbered paragraphs are predicated is as follows:

a. According to Polaris's website (at https://www.polarisbanklimited.com/), Polaris is a Nigerian retail bank established by the Central Bank of Nigeria in 2018 to offer commercial banking services to the Nigerian public;[1]

b. Also according to Polaris's website (at https://www.polarisbanklimited.com/international-funding/), it has an international funding desk responsible for managing and developing relationships with international banks. Polaris further states that "[w]e provide optimal value-enhancing services to facilitate our respective clients' businesses. Some of our correspondent banks/institutions include: Citibank,.... [and] Standard Chartered Bank,…".

75. According to Polaris's 2022 annual report (which is the last year for which the report is made available on the Polaris website (at https://www.polarisbanklimited.com/our-financial-statements/)), it has correspondent banking relationships with Citibank, New York (399 Park Avenue, NY NY) and United Bank for Africa, New York (1 Rockefeller Plaza, 8th Floor, NY NY). (A true and correct copy of excerpted pages from the 2022 Annual Report are attached hereto as Exhibit 4.);

[1] Also according to Polaris's website, it has 350 branches, but only in Nigeria.

a. According to Polaris's website (at https://www.polarisbanklimited.com/about-us/), in 2018 Polaris assumed the assets and certain liabilities of Skye Bank;

b. According to The Bank Directory, 2018, Skye Bank used Standard Chartered Bank, New York City, as a correspondent bank and it is likely that the same correspondent banking relationship was transferred to Polaris.[2]

76. Norden seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching, *inter alia*, any monies of Polaris held by the Garnishees, specifically the banks identified above within the District, for the purpose of obtaining personal jurisdiction over Polaris and to secure Norden's claims, as described above.

**AS AND FOR A FIRST CAUSE OF ACTION:**
**ATTACHMENT OF INTANGIBLE PROPERTY OF POLARIS**

77. Polaris breached its maritime contractual obligations to Norden.

78. Polaris's breach caused Norden to suffer damages in the amount of not less than $1,052,692.50 (the amount of the final partial award) plus either (b) $4,235,377.23 (the total remaining amount sought to be recovered in the LMAA arbitration), or (c) $2,451,876.89 (alternative amount sought under alternative theories of recovery), plus (d) interest, costs and attorney's fees (which are recoverable under English law) of $712,833.52.

79. Norden expressly reserves all of its rights to have the underlying merits of its remaining claims resolved by the pending LMAA arbitration in London.

---

[2] *The Bank Directory (Including Worldwide Correspondents & Resource Guide)* is a comprehensive reference listing international banks, their branches, their correspondent banks and the SWIFT/BIC codes for those correspondent banks.

80. Norden brings this action to obtain *quasi in rem* jurisdiction over Polaris, and security for the enforcement of the final partial award, and any other resulting awards and/or judgments which it may obtain against Polaris.

81. Polaris cannot be found within this District, but its property (namely monies held at the garnishee banks) are now, may be, or soon will be, found within this District.

82. Norden is accordingly entitled to attach Polaris's property (namely monies in said accounts) within this District.

83. Norden seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching any and all assets of Polaris in the alternative amounts set forth in Paragraph 78, above, for the purpose of obtaining personal jurisdiction over Polaris and to secure Norden's claims, as described above.

WHEREFORE, Plaintiff prays for the following:

(A) That process in due form of law issue against Defendant citing it to appear and answer under oath all and singular the matters alleged in this Verified Complaint, failing which default judgment be entered against it in the amount of not less than $1,052,692.50 but up to the amount of $5,288,069.73, plus interest, costs and attorneys' fees of $712,833.52;

(B) That since Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all property, tangible or intangible, in whatever form, in the amount of not less than $1,052,692.50 but up to the amount of $5,288,069.73, plus interest, costs and

attorney's fees of $712,833.52, belonging to, due to, held for, or otherwise owned by or for the benefit of Defendant, moving through, or within the possession, custody or control of the Garnishees specifically identified herein (or to be named), to establish personal jurisdiction over Defendant and to secure Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Rules B and E, answer the matters alleged in this Verified Complaint.

(C) That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

(D) That this Court recognize and confirm any award or judgment(s) rendered on the claims against Defendant set forth herein as a judgment of this Court;

(E) That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

(F) For such other and further relief as the Court deems just and proper.

Dated: New York, NY
June 17, 2026

Respectfully submitted,
FLOYD ZADKOVICH (US) LLP

By: /s/ Joseph Johnson
Joseph Johnson
Edward W. Floyd
Luke F. Zadkovich

33 East 33rd Street, Suite 905
New York, New York 10016

joe.johnson@floydzad.com
Phone: (917) 375-9511
ed.floyd@floydzad.com
Phone: (917) 999-6914
luke.zadkovich@floydzad.com
Phone: (917) 868 1245

*Attorneys for Plaintiff*

VERIFICATION

Pursuant to 28 U.S.C. § 1746, ____________________ declares as follows:

I am **Head of Shipping Legal** of Plaintiff, Dampskibsselskabet Norden A/S, and an authorized officer thereof. I have been so affiliated at all times referred to in the foregoing Verified Complaint. I have read the foregoing Verified Complaint and know the contents thereof. I verify that I believe the allegations contained therein to be true to my own knowledge, except as to matters stated to be upon information and belief, and as to those matters I believe them to be true. The grounds for my belief are based upon my personal knowledge gained during the course of my professional duties as **Head of Shipping Legal** and my review of and familiarity with correspondence and other relevant documents, including the exhibits to the foregoing Verified Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 19th day of June, 2026 in Singapore.

______________________________
JENNY BAZAKAS

## SCHEDULE 1

(LIST OF GARNISHEES AND THEIR LOCATIONS,
WHICH INCLUDES SUCH OTHER LOCATIONS WITHIN THIS DISTRICT
AT WHICH THE RESPECTIVE GARNISHEES MAY BE FOUND)

1. Citibank, N.A., New York Branch, 399 Park Avenue, NY, NY 10043
2. Standard Chartered Bank, New York Branch, 3 Bryant Park, NY, NY 10036
3. United Bank for Africa, New York Branch, 40 E 52nd St, NY, NY 10022